## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

PHYLLIS SWAN,

                   Plaintiff,                           Case No. 1:22-cv-10406

     -against-

                                                  **Jury Trial Demanded**

SOTHEBY'S, INC. AND
ROBERT EVERETT PAGE IV

                   Defendants.

-------------------------------------------------------x

1

**COMPLAINT**

Plaintiff, Phyllis Swan, ("Ms. Swan", "Plaintiff Swan") by her attorney Renee Eubanks, Esq. of the Eubanks Law Firm, PLLC, brings this action against Sotheby's Inc. and all related subsidiaries and/or entities that took part in the actions alleged below and Robert Everett Page IV (separately, "Defendant Sotheby's" and "Defendant Page" or together "Defendants") and allege as follows:

**INTRODUCTION**

1.     New York has a strong public policy interest in preventing the state from being a haven for trafficking stolen and/or misappropriated artwork. This case goes to the heart of that public policy concern and this state's mission to protect the rights of true owners of stolen and/or misappropriated artwork.

2.     New York State also has an interest in ensuring that auction houses and their consignors behave in a manner that discourages them from placing profit above the ownership interest of a true owner.

3.     In addition,  given the public nature of their actions and the impact on this State's consumers, auction houses must act with integrity as a seller of goods in the public market, ensure that proper diligence is performed before an item is placed in the market for sale, and that appropriate actions are taken as soon as the auction house receives credible information that an item it has placed for sale is the subject of a title dispute.

4.      Based on the public policy goals of this State, it is ***not*** the role of the auction house, upon

receipt of credible information regarding ownership, to act aggressively to defeat the true

owner and impose obstacles to the owner asserting its rights, and instead collude with a

consignor that has no proof of ownership, to advance the profit goals of the auction house.

5.      Such behavior violates the public trust given to auction houses in this State and

unfortunately Defendant Sotheby's is a repeat offender in violating New York State's public

trust.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.§ 1332 because there is

complete diversity of citizenship between Plaintiff and the Defendants, and the amount in

controversy exceeds $75,000.  Diversity of citizenship exists because Plaintiff is a citizen of

Ohio whose address is 2910 Lawndale Ave, Cincinnati, Ohio, 45212 and each of the

Defendants is a citizen/resident of New York.

7.      Personal jurisdiction over Defendants is proper. Defendant Sotheby's is a business having

a principal place of business located at 1334 York Avenue, New York, NY 10021. Defendant

Robert Page's last known address is 222 West 83rd Street, New York, New York 10024. With

respect to the artwork in question, the Defendants entered into a consignment agreement

in the State of New York, conducted activities related to the sale of the artwork in State of

New York and coordinated their actions in the State of New York, and the harm caused to

Plaintiff Swan arose out of continuous and intentional actions by Defendants conducted in

this State and Judicial District.

8.      This Court has authority to hear causes of action seeking declaratory judgment pursuant

to 28 U.S.C. §§ 2201, 2202.


**FACTUAL BACKGROUND REGARDING CLAIMS FOR RELIEFT**

9.      Isaia Rankin was a major fashion designer on the New York scene in the 1980's. His

death was written up in the New York Times on July 11, 1989.[1]

10.     Plaintiff, Phyllis Swan was Mr. Rankin's high school sweetheart. They spent their lives

after high school together, starting off in their hometown of Cincinnati, Ohio and eventually

ending up in New York in the 80's at a time when the Lower East Side was teeming with creative

talent in music, fashion design and art.  The couple was so close, and their lives so intertwined

that, Ms. Swan, for a long period of time, used the name Phyllis Rankin.

11.     Once they were both in New York, the couple immersed themselves in the world of

fashion design and collaborated on various projects which included the design, manufacture,

and sale of clothing. Ms. Swan would often identify pieces that would be both easy and cost

effective to manufacture that would appeal to young women customers. Together, they

brought to the New York fashion scene the hugely popular tube skirt, which was made of

spandex and sewn together with one seam. The skirt was a fashion staple of almost everyone

woman's closet during the 1980's.

12.     Eventually, consistent with the dream they had shared since high school, Ms. Swan and

Mr. Rankin partnered to open a retail clothing store on the Lower East Side called Fertility.

---

[1] New York Times July 11, 1989 "Isaia Rankin Is Dead; Dressmaker was 35"

Fertility was initially located at 113 East 12th Street in New York.

13.     As their fashion endeavors gathered steam, Ms. Swan and Mr. Rankin's circle of associates included a host of people who would go on to achieve creative success. Those individuals included people like Madonna, Anna Sui, Betsy Johnson and Jean-Michael Basquiat. It is Mr. Rankin and Ms. Swan's friendship and collaboration with Mr. Basquiat that is at the heart of this case.

14.     In the early 1980's before he would go on to critical acclaim and success as a renowned artist, Jean-Michael Basquiat was a struggling artist trying to get exposure for his art. During this time, he would agree to put his art on bags, T-shirts, and other items, working directly with retailers on the Lower East Side. At the same time, Ms. Swan and Mr. Rankin were establishing Fertility.

15.     Mr. Rankin and Mr. Basquiat became friends and at some point, after Fertility was opened, they along with Plaintiff Swan, met to collaborate on a business card for Fertility that would include artwork by Mr. Basquiat. The three met one evening at Ms. Swan and Mr. Rankin's loft to design the card. Mr. Basquiat's sketching and drawing to help create the business card is the artwork that is the property in this matter.  *See Exhibit i.*

16.     As Mr. Basquiat was creating the drawing, the three discussed what should go on the card including things like the address of Fertility, the hours of operation, the proprietors' names, as well as whether the name Fertility should be trademarked.

17.      It was Mr. Basquiat's idea to include the proprietors' names which is why the drawing includes the text "proprietors Isaia Rankin Phyllis Swan".

18.     After Mr. Basquiat finished his preliminary sketch, Ms. Swan had reservations about the

drawing and whether it was exactly right for the business card.  At the close of the collaboration, she and Mr. Rankin kept the drawing and Fertility continued in business. Mr. Basquiat would thereafter become an internationally famous artist, eventually passing away in August of 1988 at the peak of his fame.

19.     While Mr. Basquiat was enjoying success before his death, Ms. Swan and Mr. Rankin continued their fashion endeavors which transformed Mr. Rankin into a New York fashion darling, working with high fashion retailers of the time, Barney's and Charivari.

20.     While Mr. Rankin focused on the creative endeavors with Barney's, Ms. Swan focused on Fertility.  Although Fertility eventually moved from its original location to 130 Spring Street, Ms. Swan and Mr. Rankin kept Fertility's business papers and other assets in boxes at the old location. Within those boxes was the artwork for the business card for Fertility created by Ms. Swan and Mr. Rankin with Mr. Basquiat.

21.      As Mr. Rankin's success with outside retailers took off, the business grew, and he hired several employees. One of these employees was Defendant Robert Page. Mr. Page worked primarily on the project with Barney's and with Mr. Rankin on other fashion ideas.

22.     Defendant Page worked primarily at a business location at 240 West 38th Street but had access to the location at 113 Spring Street where the Fertility boxes were located.

23.     Although Mr. Rankin's fashion footprint became significant, tragedy was also on the horizon and Mr. Rankin was diagnosed with AIDS. By July of 1989, Mr. Rankin would pass away from the disease.

24.     Without question, Ms. Swan was emotionally devastated and distracted by his death. Amid her grief over Mr. Rankin's death, she had to worry about her own health, bury her long-

time companion, wrap up his estate, fight with Lenox Hill Hospital over alleged negligence while he was in their care and hire a new designer for the business.

25.     It was amid this personal loss and chaos, that employees who had worked with Mr. Rankin, looted the belongings at the 113 Spring Street and 240 West 38th Street locations, taking things after his death without Ms. Swan or Mr. Rankin's estate's permission. Ms. Swan, overwhelmed and suffering from personal problems, could not hold the business together and eventually moved back to Cincinnati, taking her possessions, including the boxes with the items she had stored from Fertility with her.

26.     Within a few years, Ms. Swan started to put her life back together and she began looking though the Fertility boxes for the Basquiat artwork.  Initially, she could not find the artwork but was unsure whether she had missed it in her search or whether it had been taken years earlier by one of Mr. Rankin's employees in New York.

27.     Ms. Swan would be plagued by doubt about the whereabouts of the Basquiat drawing for almost three decades. At one time, she believed the artwork had been lost as she transported the Fertility boxes from place to place. For example, at one location where she lived, there was a fire and a few of the boxes were lost in the fire.

28.     Although loss of the artwork in this manner was possible, Ms. Swan also continued to believe that maybe the artwork had been stolen by one of the employees in New York. Unfortunately, she had no proof that the artwork had been stolen and had no way of knowing whether it had perished in the fire or had been otherwise lost during her moves.

29.     For almost 30 years, Ms. Swan would speak to friends, family, and others about her search for her Basquiat artwork. The artwork was important to her not just because it was a

work by the famous Jean-Michael Basquiat, but also because it was a piece of her history with

Mr. Rankin. She was personally aggrieved and deeply troubled over its loss.

30.     Fortunately, Ms. Swan's decision to pour out her grief about the artwork would lead to

its discovery.  Almost 30 years after it went missing, a friend of Ms. Swan's who knew of Ms.

Swan's search for the Basquiat work, was alerted to a Sotheby's auction by an individual in

London.  The friend received an article which discussed and/or showed a Basquiat drawing

called Isaia's Fertility and the auction at Sotheby's. The Basquiat drawing included the words

Fertility, had the address of the store and text that says, "Proprietors Isaia Rankin Phyllis Swan".

31.     Ms. Swan's friend immediately knew it was the artwork Ms. Swan had been looking for.

Ms. Swan's friend immediately reached out to notify Ms. Swan.

32.      Interestingly, the Sotheby's website revealed that the artwork was from the collection

of Robert Page, the former New York employee who worked closely with Mr. Rankin.

33.      Although the Sotheby's catalogue note contained erroneous statements that the work

was a collaboration by Mr. Basquiat and Mr. Rankin only, the note confirmed that the work was

for the store Fertility.

34.     The catalogue note goes on to state, in error, that the artwork was gifted to Mr. Rankin

by Mr. Basquiat and erroneously implies that the artwork is a portrait of Mr. Rankin.

35.     When creating the artwork, Mr. Basquiat, Mr. Rankin and Ms. Swan worked together for

mutual benefit, Mr. Basquiat wanted his artwork widely circulated via the business card and

Mr. Rankin and Ms. Swan wanted a distinct business card for their store Fertility.

36.     A distinct business card creates a memorable impression on existing and potential

customers, it is branding and marketing material, an asset belonging to the business.

37.     Pursuant to New York Partnership Law, an asset of a partnership is jointly owned by the partners and no partner can dispose of such asset without the consent of the other.

38.      At some point in 2019 Defendant Page emerged with the artwork and eventually entered into an agreement to arrange for Defendant Sotheby's to market and sell the artwork created for Fertility.

39.     In a conversation in October of 2019 after the sale of the artwork, Sotheby's attorney Aimee Schilleri ("Schilleri") made statements that Defendant Page had told Sotheby's that the artwork had been gifted to him by Mr. Rankin because Defendant Page had taken care of Mr. Rankin during his illness prior to his death.

40.     Sotheby's attorney Schilleri also stated that Sotheby's had not received any documentation to support Defendant Page's claim that the work had been gifted to him.

41.     Despite Mr. Rankin's high profile, Defendant Sotheby's made no effort to reach out to Mr. Rankin's heirs and did not attempt to contact Ms. Swan, whose name is shown in the artwork.

42.     Defendant Sotheby's did, however, arrange for Defendant Page to be interviewed and have the piece published before the auction and arrange for someone to create a catalogue note that, unbeknownst to the buying public, was replete with information that misrepresents the origins of the artwork, including but not limited to the intent of the artwork and what the work is displaying.

43.     Despite Defendant Page's alleged story that the artwork was a gift for him taking care of Mr. Rankin, the published interview arranged by Sotheby's indicates that Mr. Rankin had full-time professional nursing care.

44.     Even though Defendant Sotheby's catalogue note describes the artwork as a portrait piece of Mr. Rankin, in the article, Defendant Page directly links the artwork to Mr. Rankin's store Fertility.

45.     Other red flags were abundant. The interview article was published by Sotheby's on September 20, 2019, twelve days prior to the auction. *See Online Article, Isaia Rankin: A Force of Fashion Who Collaborated with Basquiat by Stephanie Sporn*, September 20, 2019**.**  In the interview, Defendant Page makes a series of statements that clearly indicate that the artwork was created for Fertility, the business owned by Mr. Rankin and Ms. Swan, not a portrait piece.

46.     Defendant Page also mentioned in the article that the artwork was a *collaboration* between Mr. Rankin and Mr. Basquiat while omitting Ms. Swan. He also confirms that Mr. Rankin had two nurses who looked after him during his illness. The artwork containing the key text about the proprietors of Fertility, as well as Defendant Pages' statements in the article should have raised red flags for Defendant Sotheby's *prior to* the sale. However, Sotheby's continued undaunted in an effort to make profits from the sale of the artwork.

47.     Defendant Sotheby's sold the artwork on behalf of Defendant Page at auction on October 2, 2019.  Defendant Sotheby's set the price of the work and collected a commission for marketing and facilitating the sale.

48.     Defendant Page believed he would receive the proceeds from the sale of the artwork and was motivated to receive these proceeds when he entered into the consignment agreement with Sotheby's.

49.      Plaintiff Swan reached out to Sotheby's in early October 2019 after her friend alerted her to the sale.  At this point, the proceeds of the sale had been provided to Sotheby's but had not been forwarded to Defendant Page. Plaintiff Swan was summarily rebuffed and treated with disdain by Defendant Sotheby's.

50.     Plaintiff Swan then turned to an acquaintance with greater business experience who was familiar with Sotheby's and had that individual place a call to Sotheby's on her behalf.

51.     Defendant Sotheby's initially appeared to cooperate with this individual, however that individual was also rebuffed, treated curtly, and told that Sotheby's planned to release the sale proceeds to the Defendant Page and that those funds would be released within three days.

52.     Sotheby's attorney Schillieri further advised the individual that to stop the release of the proceeds Ms. Swan would have to hire a lawyer before the three-day period expired. Defendant Sotheby's knew or should have known this requirement would be a great burden and hurdle to Ms. Swan's ability to obtain legal counsel to assert her ownership rights.

53.     Fortunately, Ms. Swan was able to find counsel and her counsel reached out to Sotheby's counsel by email on November 6, 2019.  The email was followed by a phone conversation on November 7, 2019. During the phone conversation, Sotheby's attorney Schilleri showed continued resistance to Ms. Swan's claim.

54.     Sotheby's counsel disclaimed any significance to the fact that Ms. Swan's name appeared on the artwork and insisted that Sotheby's would need documentation to show her ownership.

55.      In response to a question as to whether Defendant Page had shown documentation of his ownership, Sotheby's counsel stated that he had not. Counsel for Sotheby's stated that Defendant Page had only provided a story stating that the artwork was gifted to him by Mr. Rankin, in exchange for him taking care of Mr. Rankin during his illness.

56.     In response to a question as to whether Sotheby's had a least cleared the gift story with Mr. Rankin's heirs, Sotheby's counsel confirmed that they had not.[2]

57.     Sotheby's counsel also countered with irrelevant arguments and statements to disregard Ms. Swan's claims that were clearly counter to the laws of New York State.

58.     The phone conversation concluded with an agreement for Sotheby's to continue to hold the proceeds from the sale and for Defendant Sotheby's to be provided with preliminary proof of Ms. Swan's claim.

59.      Sotheby's counsel also provided information regarding Sotheby's standard protocol in such matters. Sotheby's counsel stated that if Ms. Swan provided credible evidence of her claim and wanted the artwork returned to her, Sotheby's would rescind the sale and hold the artwork in escrow until the matter of ownership was resolved.

60.     After hearing from Ms. Swan, reviewing the artwork and the article published by

---

[2] At the time of his death Mr. Rankin was survived by Ms. Swan, his parents and six siblings.

Defendant Sotheby's containing Defendant Page's statements, counsel for Ms. Swan sent

Sotheby's a letter on November 14, 2019, detailing the basis for Ms. Swan's ownership. *See*

*Exhibit ii*.

61.    The letter stated that Ms. Swan's ownership was likely proven as a matter of law since it

was clear from Defendant Page's own statements that the artwork was created for a business,

making it a business asset.

62.    The letter also stated that there could be no dispute that Ms. Swan was one of the

owners of Fertility because the artwork itself contained the text in Mr. Basquiat's handwriting

which states "Proprietors Isaia Rankin Phyllis Swan".

63.    The letter confirmed that Ms. Swan never consented to gift her business asset to anyone

and confirmed that as a legal matter, even if Defendant Page's story were true, Mr. Rankin, as a

business partner, would have no legal standing to gift a business asset without Ms. Swan's

consent and he would have no legal standing to gift a business asset in his capacity as an

individual.

64.    The letter also requested that Sotheby's provide the name of the person in possession

of the artwork. In previous emails, Sotheby's was also asked for contact information for

Defendant Page. On each occasion, Defendant Sotheby's refused to provide the requested

information for any of these individuals and/or entities.

65.    Shortly before the November letter went out, Defendant Sotheby's counsel phoned

Plaintiff's counsel and sent an email stating the "consignor" (Defendant Page) was again

pressuring her to release the funds. She stated the consignor (Defendant Page) was frustrated and that she needed to receive the letter as quickly as possible.

66.     Within eleven minutes of her receipt of the letter, Sotheby's counsel responded by email that Sotheby's had forwarded the letter to the consignor and that *per the consignor* Sotheby's was going to follow its standard protocol to rescind the sale and take the artwork into their possession while the parties resolved the issue of ownership.  Sotheby's counsel also confirmed that she would be on vacation thru the 25th of November just prior to the Thanksgiving holiday.

67.     After hearing nothing, on December 3, 2019, Plaintiff's counsel reached out to Sotheby's counsel to confirm whether Sotheby's had completed the rescission process and was in possession of the artwork. Defendant Sotheby's counsel did not respond for a week.

68.     When Defendant Sotheby's counsel did respond via email on December 10th, the response contained a sudden and shocking about-face. Sotheby's counsel put forth a clearly incorrect legal theory that Ms. Swan had no rights because the buyer had paid for the artwork and therefore legal title had been passed to the buyer. Sotheby's counsel Schilleri's statements were clearly incorrect under New York law and numerous case law precedents. Schilleri, an in-house lawyer at a prestigious art auction house, knew or should have known that such statements were incorrect.

69.     Sotheby's then indicated in another about face, that went directly against its November 14th response, that it had not received sufficient documentation from Ms. Swan regarding her ownership.

70.     In a particularly aggressive tone, Sotheby's counsel fantastically stated for the first time that Ms. Swan had failed to provide information regarding her claim and stated that it would need sufficient documentation or a court order, or it would release the funds to the consignor (Defendant Page) in three days. The November 14th letter that had previously caused them to state that they would rescind the sale was inexplicably ignored.

71.      Most telling of the disingenuous nature of the response, Defendant Sotheby's gave no helpful information on what additional documentation would be sufficient. It once again seemed that Sotheby's was working vigorously on behalf of Defendant Page whose interests it was aligned with, rather than cooperating to confirm the true owner.

72.     Counsel for Ms. Swan responded by reiterating that Defendant Sotheby's attorney had agreed to rescind the sale and take possession of the artwork on November 14th and sent an email to Sotheby's on December 10, 2019 that demanded that Defendant Sotheby's return the artwork to Ms. Swan based on the clear and convincing evidence provided in the Sotheby's article and the text in the artwork itself, that the artwork was a business asset of Fertility and thus was owned by Ms. Swan the undisputed owner of that business. *See Exhibit iii.*  Sotheby's was also notified that if it released the funds and/or did not return the artwork or took any action that caused the artwork to go underground once more, a lawsuit against Sotheby's would ensue.

73.     In response to the demand, Sotheby's attorney Schilleri admitted in a subsequent phone conversation on December 12th and later via email, that Defendant Sotheby's ***had not followed***

*its protocol* to seek rescission and take possession of the artwork as promised a month earlier and that the artwork remained in the possession of the buyer.

74.     When Plaintiff's counsel asked to receive the contact information for the buyer to proceed with a routine case for replevin against the buyer, Defendant Sotheby's refused to provide this information and instead embarked on a convoluted interpleader filing, a tactic that caused additional barriers to Ms. Swan's ability to have the artwork returned to her, and preserved Defendant Page's economic interests by keeping him in the litigation.

75.     Thereafter, Defendant Sotheby's and Defendant Swan entered a stipulation subject to conditions set by Judge Carol Edmead. Judge Edmead based her grant of Sotheby's interpleader motion on Sotheby's explicit promise to give up all economic interest in the artwork, including charging any fees for insurance, storage, etc., along with any right to pursue sale and commissions. Judge Edmead's order was entered on February 2, 2020. *See Exhibit iv*.

76.   Despite Defendant Sotheby's promise to the court that it was stepping out of the matter to let Plaintiff Swan and Defendant Page work out the issue of ownership, months later, Sotheby's was again colluding with Defendant Page to coerce Plaintiff Swan to sell the artwork thru Sotheby's, something explicitly prohibited by Judge Edmead and the court order.

77.     The collusion and coercion were furthered when Defendant Sotheby's outside counsel coerced that if Plaintiff Swan would agree to a sale using Sotheby's, Defendant Sotheby's would refrain from charging Plaintiff Swan storage fees, something explicitly prohibited by the court order.

16

78.    At all times from the time Defendant Sotheby's entered into the consignment

agreement with Defendant Page, Defendant Sotheby's has failed to exercise a minimum degree

of due diligence to ensure prior to sale that the artwork was not stolen and/or misappropriated.

79.    At all times from the time Defendant Sotheby's entered into the consignment

agreement with Defendant Page, Defendant Sotheby's engaged in a series of marketing

activities that falsified the nature and the origin of the artwork in connection with placing the

artwork in the public domain for sale in furtherance of its own profit.

80.    At all times from the time Defendant Sotheby's entered into the consignment

agreement with Defendant Page, on information and belief, Defendant Sotheby's was

contractually allowed to set the price based on the lower end of the estimate of the artwork's

value, and brought the artwork to the market at $40,000, a market value lower that the actual

estimated market value of $60,000, thus devaluing artwork to the detriment of the true owner,

Ms. Swan. [3]

81.    At all times from the time Defendant Sotheby's entered into the consignment agreement

with Defendant Page, on information and belief, Defendant Sotheby's took direction from

Defendant Page and joined Defendant Page's efforts to interfere with Plaintiff Swan's

ownership rights.

---

[3] Based on appraisal, market appreciation and high demand for the artist's work, the current value of the artwork is estimated to be in excess of $75,000.

82.     At all times from the time Defendant Sotheby's was contacted by Plaintiff Swan, Defendant Sotheby's subjected Ms. Swan to treatment that caused Ms. Swan to feel extreme grief, sadness, frustration and feelings of belittlement.

83.     At all times Defendant Sotheby's chose to believe Defendant Page's version of events without investigation or receiving even cursory evidence that Defendant Page's story was true, even though many red flags suggested Defendant Page's story was untrue.

84.     At all times Defendant Page, knew that the artwork was for the store Fertility and that the proprietors of Fertility were Isaia Rankin and Phyllis Swan.

85.     At all times from the time Defendant Page entered into the consignment agreement with Defendant Sotheby's, Defendant Page engaged in a plan to sell the artwork for his economic benefit and to keep Ms. Swan from pursuing her legal rights to have the artwork returned to her. Defendant Sotheby's was a willing participant in this plan.

### 1st   Cause of Action- Conversion Defendants Sotheby's and Page

86.     Plaintiff Swan re-asserts the allegations in paragraphs 1 -85 above and incorporates them by reference as if fully set forth herein.

87.     Defendant Sotheby's and Defendant Page colluded and engaged in intentional and deceptive conduct, when Defendant Sotheby's made the statement in December 2019 that Plaintiff Swan had no rights to the artwork because title to the artwork passed to the buyer upon payment to Defendant Sotheby's when Sotheby's legal counsel knew or should have known the law in New York was in opposite of those statements.

88.     Defendant Sotheby's, from the date of the consignment agreement with Defendant Page to the present, was in possession of the artwork, retained the sole right to repossess the artwork from the bona fide purchaser, and upon Plaintiff's Swan's written demand on December 10, 2019, repossessed the artwork and remains in possession of it.

89.     Once Defendant Sotheby's received evidence of Ms. Swan's superior possessory interest and superior title in the artwork as a proprietor of Fertility who had never voluntarily given up possession of the business asset artwork to any party, Defendant Sotheby's and Defendant Page colluded to keep the artwork from Ms. Swan and to exercise dominion and control over the artwork.

90.     Defendant Sotheby's and Defendant Page further colluded to keep the artwork from Ms. Swan, including but not limited to attempting to coerce her to agree to sell the artwork with Defendant Page via Sotheby's against the clear conditions required in a court order, in lieu of returning it to her.

91.     In every instance both Defendant Sotheby's and Defendant Page's goal was to deny Plaintiff Swan's rights as the true owner, keep the artwork out of Plaintiff's possession and to profit from the sale of the artwork to Plaintiff's detriment.

**2nd Cause of Action Replevin Against Defendant Sotheby's**

92.     Plaintiff Swan reasserts the allegations in paragraphs 1-91 above and incorporates them by reference as if fully set forth herein.

93.     Defendant Sotheby's took possession of the artwork from Defendant Page, repossessed the artwork from the bona fide purchaser and to date retains possession of the artwork.

94.     Based on statements by Defendant Sotheby's attorney Schilleri, Defendant Sotheby's was not provided with any written or other documentation that supported Defendant Page's bare claim that the work was gifted to him and made no efforts to perform even the slightest due diligence to confirm the artwork's provenance.

95.     Upon information and belief, Defendant Sotheby's has a policy of not verifying the title and/or confirming the provenance for artwork under a certain dollar threshold amount and Defendant Sotheby's failure to confirm Defendant Page's story and their decision to place the artwork up for sale without performing any due diligence appears consistent with this policy.

96.   Plaintiff Swan provided Defendant Sotheby's with sufficient evidence based on New York law that she had superior rights over Defendant Page; thereafter Defendant Sotheby's failed its duty to protect the rights of true owners and the buying public, to inquire and/or investigate to confirm Plaintiff Swan's account and instead chose to collude with Defendant Page to profit from the sale of the artwork.

97.   Pursuant to New York Partnership Law as the owner of Fertility and a collaborator that worked on the creation of the work with Mr. Basquiat and Mr. Rankin as a business card for the business, Plaintiff Swan has superior rights and title to the work over Defendant Sotheby's and Defendant Sotheby's is obligated to return the work to Plaintiff Swan. On or about August 31, 2020, the Defendant Sotheby's obtained a full release from Defendant Page; accordingly, Defendant Sotheby's is not legally prohibited from returning the work to Ms. Swan and would suffer no legal liability from returning the work to her.

**3rd Cause of Action Request for Declaratory Judgment Quiet Title-Defendant Page**

98.     Plaintiff Swan reasserts the allegations in paragraphs 1-97 above and incorporates them by reference as if fully set forth herein.

99.     Plaintiff Swan as the proprietor of Fertility and a collaborator of the work with Mr. Basquiat and Mr. Rankin to create the artwork/business card, provided Defendant Sotheby's and Defendant Page with clear and convincing evidence including but not limited to, that she was a proprietor of Fertility, that she was posthumously identified as a proprietor of the business in the artwork by Mr. Basquiat and that she never voluntarily gave up her rights to any person, including Mr. Rankin, her business partner and co-owner of the business asset.

100.    Plaintiff disputes that Defendant Page has any rights to the artwork. Plaintiff disputes Defendant Page's story regarding the artwork being gifted to him is true, however even if Defendant Page's story were true, Defendant Page could not have acquired legal title to the artwork since pursuant to New York Partnership law, Mr. Rankin had no rights to gift a business asset to a third party without obtaining consent from his business partner, Plaintiff Swan.

101.    Based on New York CPLR 4519, Defendant Page cannot offer testimony to support his story that Mr. Rankin, who died six months after the purported "gift", in fact gifted the work to Defendant Page.

102.    Since Defendant Page refuses to allow Defendant Sotheby's to return the artwork to Ms. Swan and maintains his gift story, there is a substantial controversy and a live dispute between the Plaintiff and the Defendants having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. The dispute, therefore, between

Plaintiff and the Defendants is a justiciable controversy appropriate for declaratory judgment

and entry of a judgment declaring that Plaintiff Swan is the sole owner of the artwork in

compliance with the Declaratory Judgment Act, 28 U.S.C. §§2201, 2202.

### 4th Cause of Action Intentional Infliction of Emotional Distressed Defendants Sotheby's and Robert Page

103.    Plaintiff Swan reasserts the allegations in paragraphs 1-102 above and incorporates

them by reference as if fully set forth herein.

104.    Defendant Sotheby's and Defendant Page colluded to keep the artwork from Plaintiff

Swan after she retained counsel and provided the November 2019 letter, and thereafter, up to

and including after the court issued an order in February of 2020 prohibiting Sotheby's financial

involvement in the matter; this behavior represents intentional conduct to further each

Defendant's profit motive, to the exclusion and disregard of Plaintiff's ownership rights.

105.    Such behavior by Defendants is akin to aiding and abetting theft and/or trafficking or

attempting to traffic stolen property. Such behavior, especially by Defendant Sotheby's, who

must honor the public trust as a licensed seller of goods,  is extreme and outrageous and goes

squarely against the public policy goals of this State to enforce and protect the rights of true

owners against those that attempt to evade them for their own profit.

106.     Defendant Sotheby's and Defendant Page's collusion to keep Plaintiff Swan from the

artwork has not only kept her from her "property",  but has also kept her from a significant

emotional and tangible connection with her life partner Isaia Rankin and the store they

dreamed of opening together.

107.     As a result, Defendants' actions have caused Ms. Swan extreme emotional hardship frustration and stress, and specifically, Defendant Sotheby's treatment of her has caused her to experience feelings of belittlement, grief, and other emotional distress.

108.     At all times Defendant Sotheby's and Defendant Page's actions, both joint and several, were intentional and in reckless disregard for Plaintiff Swan's ownership rights, for the sole purpose of Defendants' receiving of profits from the sale of her artwork for their benefit.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Phyllis Swan, respectfully request that the Court enter judgment as follows:

(a) Directing Defendant Sotheby's to immediately return the artwork to Plaintiff Swan;

(b) Issuing a Declaratory Judgment declaring Plaintiff Swan as the sole owner of the artwork and/or that Plaintiff has superior possessory and title rights over Defendant Sotheby's and Defendant Page;

(c) Awarding monetary damages in favor of Plaintiff and against Defendants jointly and severally, arising out of Defendants' actions including but not limited to, diminution of the artwork's value, keeping the artwork, a thing of economic and *emotional value* out of Plaintiff's possession for a significant period of time and causing her emotion distress in an amount not less than $250,000;

(d)   Awarding punitive damages to Plaintiff against Defendant Sotheby's based

on its repeated conduct in violating the public policy and laws of this State and

specifically with regard to its conduct to intentionally interfere, reject and

evade Plaintiff's ownership interests in favor of its own profit and its

misrepresentation of goods it offered to the public for sale in an amount not

less than $500,000;

(e)   Awarding Plaintiff the costs of all legal actions to have the artwork returned

to her, including but not limited to court costs and attorney's fees; and

(f)   Granting such other relief and the Court may deem just and proper.

Dated: December 8, 2022

Respectfully Submitted,

By: _____

RENEE EUBANKS, ESQ.
Attorney for Plaintiff
1180 Ave of the Americas, 8th Floor
New York, New York 10036
212-390-8949