**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x

PHYLLIS SWAN,

                            Plaintiff,                            Case No. 1:22-cv-10406

        -against-

                                                              **Plaintiff's Amended Complaint**

                                                               **Jury Trial Demanded**

SOTHEBY'S, INC. AND
ROBERT EVERETT PAGE IV

                              Defendants.

----------------------------------------------------------x

**COMPLAINT**

Plaintiff, Phyllis Swan, ("Ms. Swan", "Plaintiff Swan") by her attorney Renee Eubanks, Esq. of the Eubanks Law Firm, PLLC, brings this action against Sotheby's Inc. and all related subsidiaries and/or entities that took part in the actions alleged below and Robert Everett Page IV (separately, "Defendant Sotheby's" and "Defendant Page" or together "Defendants") and allege as follows:

**INTRODUCTION**

1.    New York has a strong public policy interest in preventing the state from being a haven for trafficking stolen and/or misappropriated artwork. This case goes to the heart of that public policy concern and this state's mission to protect the rights of true owners of stolen and/or misappropriated artwork.

2.    New York State also has an interest in ensuring that auction houses and their consignors behave in a manner that discourages them from placing profit above the ownership interest of a true owner.

3.    In addition,  given the public nature of their actions and the impact on this State's consumers, auction houses must act with integrity as a seller of goods in the public market, ensure that proper diligence is performed before an item is placed in the market for sale, and that appropriate actions are taken as soon as the auction house receives credible information that an item it has placed for sale is the subject of a title dispute.

4.      Based on the public policy goals of this State, it is ***not*** the role of the auction house, upon receipt of credible information regarding ownership, to act aggressively to defeat the true owner and impose obstacles to the owner asserting its rights, and instead collude with a consignor that has no proof of ownership, to advance the profit goals of the auction house.

5.      Such behavior violates the public trust given to auction houses in this State and unfortunately Defendant Sotheby's is a repeat offender in violating New York State's public trust.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.§ 1332 because there is complete diversity of citizenship between Plaintiff and the Defendants, and the amount in controversy exceeds $75,000 based on an independent valuation of the artwork at the time this action, compensatory damages related to specific acts of Defendant Sotheby's and punitive damages since one or more of Defendant Sotheby's acts violate the public policy goals of this state.  Diversity of citizenship exists because Plaintiff is a citizen of Ohio whose address is 2910 Lawndale Ave, Cincinnati, Ohio, 45212 and each of the Defendants is a citizen/resident of New York.

7.      Personal jurisdiction over Defendants is proper. Defendant Sotheby's is a business having a principal place of business located at 1334 York Avenue, New York, NY 10021. Defendant Robert Page's last known address is 222 West 83rd Street, New York, New York 10024. With respect to the artwork in question, the Defendants entered into a consignment agreement in the State of New York, conducted activities related to the sale of the artwork in State of

New York and coordinated their actions in the State of New York, and the harm caused to

Plaintiff Swan arose out of continuous and intentional actions by Defendants conducted in

this State and Judicial District.

8.     This Court has authority to hear causes of action seeking declaratory judgment pursuant

to 28 U.S.C. §§ 2201, 2202.


**FACTUAL BACKGROUND REGARDING CLAIMS FOR RELIEF**

9.     Isaia Rankin was a major fashion designer on the New York scene in the 1980's. His

death was written up in the New York Times on July 11, 1989.[1]

10.     Plaintiff, Phyllis Swan was Mr. Rankin's high school sweetheart. They spent their lives

after high school together, starting off in their hometown of Cincinnati, Ohio and eventually

ending up in New York in the 80's at a time when the Lower East Side was teeming with creative

talent in music, fashion design and art.  The couple was so close, and their lives so intertwined

that, Ms. Swan, for a long period of time, used the name Phyllis Rankin.

11.     Once they were both in New York, the couple immersed themselves in the world of

fashion design and collaborated on various projects which included the design, manufacture,

and sale of clothing. Ms. Swan would often identify pieces that would be both easy and cost

effective to manufacture that would appeal to young women customers. Together, they

brought to the New York fashion scene the hugely popular tube skirt, which was made of

spandex and sewn together with one seam. The skirt was a fashion staple of almost everyone

---

[1] New York Times July 11, 1989 "Isaia Rankin Is Dead; Dressmaker was 35"

woman's closet during the 1980's.

12.     Eventually, consistent with the dream they had shared since high school, Ms. Swan and

Mr. Rankin partnered to open a retail clothing store on the Lower East Side called Fertility.

Fertility was initially located at 113 East 12th Street in New York.

13.     As their fashion endeavors gathered steam, Ms. Swan and Mr. Rankin's circle of

associates included a host of people who would go on to achieve creative success. Those

individuals included people like Madonna, Anna Sui, Betsy Johnson and Jean-Michael Basquiat.

It is Mr. Rankin and Ms. Swan's friendship and collaboration with Mr. Basquiat that is at the

heart of this case.

14.     In the early 1980's before he would go on to critical acclaim and success as a renowned

artist, Jean-Michael Basquiat was a struggling artist trying to get exposure for his art. During this

time, he would agree to put his art on bags, T-shirts, and other items, working directly with

retailers on the Lower East Side. At the same time, Ms. Swan and Mr. Rankin were establishing

Fertility.

15.     Mr. Rankin and Mr. Basquiat became friends and at some point, after Fertility was

opened, they along with Plaintiff Swan, met to collaborate on a business card for Fertility that

would include artwork by Mr. Basquiat. The three met one evening at Ms. Swan and Mr.

Rankin's loft to design the card. Mr. Basquiat's sketching and drawing to help create the

business card is the artwork that is the property in this matter.  *See Exhibit A*

16.     As Mr. Basquiat was creating the drawing, the three discussed what should go on the

card including things like the address of Fertility, the hours of operation, the proprietors'

names, as well as whether the name Fertility should be trademarked.

17.    It was Mr. Basquiat's idea to include the proprietors' names which is why the drawing includes the text "proprietors Isaia Rankin Phyllis Swan".

18.    After Mr. Basquiat finished his preliminary sketch, Ms. Swan had reservations about the drawing and whether it was exactly right for the business card.  At the close of the collaboration, she and Mr. Rankin kept the drawing and Fertility continued in business. Mr. Basquiat would thereafter become an internationally famous artist, eventually passing away in August of 1988 at the peak of his fame.

19.    While Mr. Basquiat was enjoying success before his death, Ms. Swan and Mr. Rankin continued their fashion endeavors which transformed Mr. Rankin into a New York fashion darling, working with high fashion retailers of the time, Barney's and Charivari.

20.    While Mr. Rankin focused on the creative endeavors with Barney's, Ms. Swan focused on Fertility.  Although Fertility eventually moved from its original location to 130 Spring Street, Ms. Swan and Mr. Rankin kept Fertility's business papers and other assets in boxes at the old location. Within those boxes was the artwork for the business card for Fertility created by Ms. Swan and Mr. Rankin with Mr. Basquiat.

21.    As Mr. Rankin's success with outside retailers took off, the business grew, and he hired several employees. One of these employees was Defendant Robert Page. Mr. Page worked primarily on the project with Barney's and with Mr. Rankin on other fashion ideas.

22.    Defendant Page worked primarily at a business location at 240 West 38th Street but had access to the location at 113 Spring Street where the Fertility boxes were located.

23.    Although Mr. Rankin's fashion footprint became significant, tragedy was also on the horizon and Mr. Rankin was diagnosed with AIDS. By July of 1989, Mr. Rankin would pass away

from the disease.

24.     Without question, Ms. Swan was emotionally devastated and distracted by his death. Amid her grief over Mr. Rankin's death, she had to worry about her own health, bury her long-time companion, wrap up his estate, fight with Lenox Hill Hospital over alleged negligence while he was in their care and hire a new designer for the business.

25.     It was amid this personal loss and chaos, that employees who had worked with Mr. Rankin, looted the belongings at the 113 Spring Street and 240 West 38th Street locations, taking things after his death without Ms. Swan or Mr. Rankin's estate's permission. Ms. Swan, overwhelmed and suffering from personal problems, could not hold the business together and eventually moved back to Cincinnati, taking her possessions, including the boxes with the items she had stored from Fertility with her.

26.      Within a few years, Ms. Swan started to put her life back together and she began looking though the Fertility boxes for the Basquiat artwork.  Initially, she could not find the artwork but was unsure whether she had missed it in her search or whether it had been taken years earlier by one of Mr. Rankin's employees in New York.

27.      Ms. Swan would be plagued by doubt about the whereabouts of the Basquiat drawing for almost three decades. At one time, she believed the artwork had been lost as she transported the Fertility boxes from place to place. For example, at one location where she lived, there was a fire and a few of the boxes were lost in the fire.

28.     Although loss of the artwork in this manner was possible, Ms. Swan also continued to believe that maybe the artwork had been stolen by one of the employees in New York. Unfortunately, she had no proof that the artwork had been stolen and had no way of knowing

whether it had perished in the fire or had been otherwise lost during her moves.

29.     For almost 30 years, Ms. Swan would speak to friends, family, and others about her

search for her Basquiat artwork. The artwork was important to her not just because it was a

work by the famous Jean-Michael Basquiat, but also because it was a piece of her history with

Mr. Rankin. She was personally aggrieved and deeply troubled over its loss.

30.     Fortunately, Ms. Swan's decision to pour out her grief about the artwork would lead to

its discovery.  Almost 30 years after it went missing, a friend of Ms. Swan's who knew of Ms.

Swan's search for the Basquiat work, was alerted to a Sotheby's auction by an individual in

London.  The friend received an article which discussed and/or showed a Basquiat drawing

called Isaia's Fertility and the auction at Sotheby's. The Basquiat drawing included the words

Fertility, had the address of the store and text that says, "Proprietors Isaia Rankin Phyllis Swan".

31.     Ms. Swan's friend immediately knew it was the artwork Ms. Swan had been looking for.

Ms. Swan's friend immediately reached out to notify Ms. Swan.

32.      Interestingly, the Sotheby's website revealed that the artwork was from the collection

of Robert Page, a former New York employee who worked closely with Mr. Rankin.

33.      Although the Sotheby's catalogue note contained erroneous statements that the work

was a collaboration by Mr. Basquiat and Mr. Rankin only, the note confirmed that the work was

for the store Fertility.

34.     The catalogue note goes on to state, in error, that the artwork was gifted to Mr. Rankin

by Mr. Basquiat and erroneously implies that the artwork is a portrait of Mr. Rankin.

35.     When creating the artwork, Mr. Basquiat, Mr. Rankin and Ms. Swan worked together for

mutual benefit, Mr. Basquiat wanted his artwork widely circulated via the business card and

Mr. Rankin and Ms. Swan wanted a distinct business card for their store Fertility.

36.     A distinct business card creates a memorable impression on existing and potential

customers, it is branding and marketing material, an asset belonging to the business.

37.     Pursuant to New York Partnership Law Section 51, an asset of a partnership is jointly

owned by the partners and no partner can dispose of such asset without the consent of the

other.

38.     Pursuant to New York Partnership Law Section 51 on the death of a partner, such

partner's rights in specific partnership property vests in the surviving partner.

39.      At some point in 2019 Defendant Page emerged with the artwork and eventually

entered into an agreement to arrange for Defendant Sotheby's to market and sell the artwork

created for Fertility.

40.     Plaintiff does not assert any independent knowledge as to how, when and from whom,

Defendant Page came to possess the artwork, and does not assert that Defendant Page stole

the artwork, but asserts that she never voluntarily relinquished her ownership to the artwork to

anyone and that a gift of the artwork to Defendant Page by Mr. Rankin, even if true, was

without her knowledge and consent as Mr. Rankin's business partner in Fertility.

41.     In a conversation in October of 2019 after the sale of the artwork, Sotheby's attorney

Aimee Schilleri ("Schilleri") made statements that Defendant Page had told Sotheby's that the

artwork had been gifted to him by Mr. Rankin because Defendant Page had taken care of Mr.

Rankin during his illness prior to his death.

42.     Sotheby's attorney Schilleri also stated that Sotheby's had not received any

documentation to support Defendant Page's claim that the work had been gifted to him.

43.     Despite Mr. Rankin's high profile, Defendant Sotheby's made no effort to reach out to Mr. Rankin's heirs and did not attempt to contact Ms. Swan, whose name is shown in the artwork and whose address Defendant Sotheby's was easily able to obtain to contact her when they wanted to name her as a defendant in an action to suit their purposes.

44.     Despite not reaching out to Ms. Swan or Mr. Rankin's heirs to vet his claims, Defendant Sotheby's arranged for Defendant Page to be interviewed, to have the piece published before the auction and arranged for someone to create a catalogue note that, unbeknownst to the buying public, was replete with information that misrepresents the origins of the artwork, including but not limited to the intent of the artwork and what the work is displaying.

45.     Red flags were abundant. The interview article was published by Sotheby's on September 20, 2019, *twelve days* prior to the auction. *See Online Article, Isaia Rankin: A Force of Fashion Who Collaborated with Basquiat by Stephanie Sporn*, September 20, 2019**.** In the interview, Defendant Page makes a series of statements that clearly indicate that the artwork was created for Fertility, the business owned by Mr. Rankin and Ms. Swan, not a portrait piece as stated in Defendant Sotheby's catalogue notes.

46.     Defendant Page also mentioned in the article that the artwork was a *collaboration* between Mr. Rankin and Mr. Basquiat while omitting Ms. Swan. He also confirms that Mr. Rankin had two nurses who looked after him full time, 24 hours per day during his illness.

47.     The artwork also contains key text about the proprietors of Fertility; this text as well as Defendant Pages' statements in the article should have raised red flags for Defendant Sotheby's *prior to* the sale. However, Sotheby's continued undaunted in an effort to make profits from the sale of the artwork.

48.     Defendant Sotheby's sold the artwork on behalf of Defendant Page at auction on

October 2, 2019.  Defendant Sotheby's set the price of the work and collected a commission for

marketing and facilitating the sale.

49.     Defendant Page believed he would receive the proceeds from the sale of the artwork

and was motivated to receive these proceeds when he entered into the consignment

agreement with Sotheby's.

50.      Plaintiff Swan reached out to Sotheby's in early October 2019 after her friend alerted

her to the sale.  At this point, the proceeds of the sale had been provided to Sotheby's but had

not been forwarded to Defendant Page. Plaintiff Swan was summarily rebuffed and treated

with disdain by Defendant Sotheby's.

51.     Plaintiff Swan then turned to an acquaintance with greater business experience who was

familiar with Sotheby's and had that individual place a call to Sotheby's on her behalf.

52.     Defendant Sotheby's initially appeared to cooperate with this individual, however that

individual was also rebuffed, treated curtly, and told that Sotheby's planned to release the sale

proceeds to the Defendant Page and that those funds would be released within three days.

53.     Sotheby's attorney Schillieri further advised the individual that to stop the release of the

proceeds Ms. Swan would have to hire a lawyer before the three-day period expired. Defendant

Sotheby's knew or should have known this requirement would be a great burden and hurdle to

Ms. Swan's ability to obtain legal counsel to assert her ownership rights.

54.     As a direct result of Defendant Sotheby's statement that she had to obtain a lawyer to

preserve her rights, Ms. Swan was forced to hire counsel and counsel reached out to Sotheby's

counsel by email on November 6, 2019.  The email was followed by a phone conversation on

November 7, 2019. During the phone conversation, Sotheby's attorney Schilleri showed continued resistance to Ms. Swan's claim.

55.     Sotheby's counsel disclaimed any significance to the fact that Ms. Swan's name appeared on the artwork and insisted that Sotheby's would need documentation to show her ownership.

56.     In response to a question as to whether Defendant Page had shown documentation of his ownership, Sotheby's counsel stated that he had not. Counsel for Sotheby's stated that Defendant Page had only provided a story stating that the artwork was gifted to him by Mr. Rankin, in exchange for him taking care of Mr. Rankin during his illness.

57.     In response to a question as to whether Sotheby's had a least cleared the gift story with Mr. Rankin's heirs, Sotheby's counsel confirmed that they had not.[2]

58.     Sotheby's counsel also countered with irrelevant arguments and statements to disregard Ms. Swan's claims that were clearly counter to the laws of New York State.

59.     The phone conversation concluded with an agreement for Sotheby's to continue to hold the proceeds from the sale and for Defendant Sotheby's to be provided with preliminary proof of Ms. Swan's claim.

60.     Sotheby's counsel also provided information regarding Sotheby's standard protocol in such matters. Sotheby's counsel stated that if Ms. Swan provided credible evidence of her claim and wanted the artwork returned to her, Sotheby's would rescind the sale and hold the artwork in escrow until the matter of ownership was resolved.

61.     After hearing from Ms. Swan, reviewing the artwork and the article published by

---

[2] At the time of his death Mr. Rankin was survived by Ms. Swan, his parents and six siblings.

Defendant Sotheby's containing Defendant Page's statements, counsel for Ms. Swan sent

Sotheby's a letter on November 14, 2019, detailing the basis for Ms. Swan's ownership. *See*

*Exhibit B*.

62.    The letter stated that Ms. Swan's ownership was likely proven as a matter of law since it

was clear from Defendant Page's own statements that the artwork was created for a business,

making it a business asset.

63.    The letter also stated that there could be no dispute that Ms. Swan was one of the

owners of Fertility because the artwork itself contained the text in Mr. Basquiat's handwriting,

which Defendant's would have confirmed as part of its authentication process, which states

"Proprietors Isaia Rankin Phyllis Swan".

64.    The letter confirmed that Ms. Swan never consented to gift her business asset to anyone

and confirmed that as a legal matter, even if Defendant Page's gift story were true, Mr. Rankin,

as a business partner, would have no legal standing to gift a business asset without Ms. Swan's

consent and he would have no legal standing to gift a business asset in his capacity as an

individual.  Plaintiff's letter was fully supported by New York State Partnership Law Section 51.

65.    The letter also requested that Sotheby's provide the name of the person in possession

of the artwork. In previous emails, Sotheby's was also asked for contact information for

Defendant Page. On each occasion, Defendant Sotheby's refused to provide the requested

information for any of these individuals and/or entities.

66.    Shortly before the November letter went out, Defendant Sotheby's counsel phoned

Plaintiff's counsel, on behalf of or at the direction of Defendant Page and sent an email stating

the consignor (now known to be Defendant Page) was again pressuring her to release the

funds. She stated the consignor was frustrated and that she needed to receive the letter as

quickly as possible.

66.     Within eleven minutes of her receipt of the letter, Sotheby's counsel responded by

email that Sotheby's had forwarded the letter to the consignor and that *per the consignor*

Sotheby's was going to follow its standard protocol to rescind the sale and take the artwork into

their possession while the parties resolved the issue of ownership.  Sotheby's counsel also

confirmed that she would be on vacation through the 25th of November just prior to the

Thanksgiving holiday.

67.     After hearing nothing, on December 3, 2019, Plaintiff's counsel reached out to Sotheby's

counsel to confirm whether Sotheby's had completed the rescission process and was in

possession of the artwork. Defendant Sotheby's counsel did not respond for a week.

68.     When Defendant Sotheby's counsel did respond via email on December 10th, the

response contained a sudden and shocking about-face. Sotheby's counsel put forth a clearly

incorrect legal theory to suggest that Ms. Swan had no rights because the buyer had paid for

the artwork and therefore legal title had been passed to the buyer.

69.     Sotheby's counsel Schilleri's statements were clearly incorrect under New York law and

numerous case law precedents. Schilleri, an in-house lawyer at a prestigious art auction house,

and her outside counsel, a lawyer at Pryor Cashman, a prestigious law firm, knew or should

have known that such statements were legally incorrect and therefore the sole purpose of such

statements appears to have been to intimidate, discourage and thus interfere with Plaintiff Swan efforts to have the property returned to her.

70.     Sotheby's then indicated in another about face, that went directly against its November 14th response, that it had not received sufficient documentation from Ms. Swan regarding her ownership.

71.     In a particularly aggressive tone, Sotheby's counsel fantastically stated for the first time that Ms. Swan had failed to provide information regarding her claim and stated that it would need sufficient documentation or a court order, or it would release the funds to the consignor (Defendant Page) in three days. The November 14th letter that had previously caused them to state that they would rescind the sale was inexplicably ignored.

72.      Most telling of the disingenuous nature of the response, Defendant Sotheby's gave no helpful information on what additional documentation would be sufficient. It once again seemed that Sotheby's was working vigorously on behalf of Defendant Page whose interests it was aligned with, rather than cooperating to confirm the true owner of the artwork.

73.     Plaintiff's counsel responded by reiterating that Defendant Sotheby's attorney had agreed to rescind the sale and take possession of the artwork on November 14th and sent an email to Sotheby's on December 10, 2019 that demanded that Defendant Sotheby's return the artwork to Ms. Swan  based on the clear and convincing evidence provided in the Sotheby's article and the text in the artwork itself, that the artwork was a business asset of Fertility and thus was owned by Ms. Swan as the surviving owner of that business.  Sotheby's was also notified that if it released the funds and/or did not return the artwork or took any action that

would cause the artwork to go underground once more, a lawsuit against Sotheby's would ensue. See Exhibit C.

74.     In response to the demand, Sotheby's attorney Schilleri admitted in a subsequent phone conversation on December 12th and later via email, that Defendant Sotheby's **had not followed its protocol** to seek rescission and take possession of the artwork as promised a month earlier and that the artwork remained in the possession of the buyer.

75.     Thereafter on December 12th and on December 13, Defendant Sotheby's only stated that it would "discuss" return of the artwork with the buyer.

76.     After December 13, 2019, Defendant Sotheby's went silent and provided no information on its discussions with the buyer and did not confirm that it sought possession of the artwork or was in the process of having the artwork returned to it.

77.     In response to what appeared to be another broken promise by Defendant Sotheby's, counsel for Plaintiff's filed an order to show cause to subpoena Defendant Sotheby's to obtain the buyer's information so that Plaintiff could proceed with a strong, routine case for replevin against the buyer.

78.     Despite having no obvious obligation to keep a buyer's information private when faced with legal process, Defendant Sotheby's refused provide this information and Ms. Schilleri indicated that instead Defendant Sotheby's would seek interpleader status and charge Ms. Swan for its attorney's fees to pursue the action.

79.    Thereafter, Plaintiff's counsel was also contacted by Defendant Sotheby's outside

counsel at Pryor Cashman. Defendant Sotheby's outside counsel more aggressively threatened

that if Plaintiff did not withdraw her subpoena, Defendant Sotheby's would file an interpleader

action against her and she would be forced to pay Defendant Sotheby's legal fees, *even if she*

*won her case*.

80.     Given that it was Defendant Sotheby's who stated that "title had passed to the buyer"

and the absence of any evidence in its privacy policy or terms and conditions that it had an

obligation to keep the buyer's identity a secret, Defendant Sotheby's had no rational reason to

keep the court from evaluating Plaintiff's request for the subpoena and honoring the subpoena

if issued.

81.     Instead, even though Defendant Sotheby's had an economic interest in the artwork and

a legal fiduciary role as an agent for the consignor, facts that by law preclude it from

interpleader status, Defendant Sotheby's pursued a disingenuous interpleader filing consistent

with its prior threat and included the false statement in its papers that it had no economic

interest in the artwork.

82.     Defendant's tactic caused additional barriers and interference with Ms. Swan's ability

to have the artwork returned to her and caused her additional attorney's fees to address the

bogus, retaliatory interpleader action.

83.     Defendant's interference also preserved its goal to pursue the sale and to maintain

Defendant Page's economic interests by keeping him in the litigation.

84.    On January 28, 2020, Defendant Sotheby's and Plaintiff Swan appeared before Judge

Carol Edmead to discuss the subpoena and the interpleader. Defendant Page, was present in

the courtroom for the proceedings but did not make an appearance in the matter; according to

the interpleader complaint Defendant Page was served by Defendant Sotheby's at his address

listed on the court paperwork as 222 West  83rd Street, New York, NY 10024. Defendant Page

provided no other address information when he signed the Stipulation.

85.    Defendant Sotheby's intentionally pursued the interpleader action, despite the fact that

as late as January 21, 2020, Defendant Page's attorney, Amelia Brankov, Esq., (Attorney

Brankov) had advised Plaintiff's counsel that the buyer still wanted the artwork, and that

Defendant Page would agree to give Plaintiff Swan a percentage of the proceeds if she

withdrew the subpoena action against Defendant Sotheby's even though Defendant Page had

no legal interests or rights in that action.

86.     Defendant Page's attorney Brankov could not have known about the buyer's

intentions or Plaintiff's subpoena without being in contact with Defendant Sotheby's about the

matter and attorney Brankov aligned her request to be consistent with Defendant's Sotheby's

goals to have Plaintiff Swan withdraw the subpoena request; this would have kept both

Defendant Sotheby's and Defendant Page's economic interests viable by impedeing Plaintiff's

direct access to the buyer, against whom her rights to have her artwork returned is most

efficient pursuant to New York Law.

87.    At the hearing on January 28th, Defendant Sotheby's was able to defeat the subpoena

action, by stating to Judge Edmead that it was in possession of the artwork.  Plaintiff had doubts

18

about this statement given the conversation with Attorney Brankov on January 21, 2020 that the buyer wanted to go through with the sale.  However, based on this statement and others by Defendant Sotehby's to Judge Edmead, Defendant Sotheby's and Defendant Swan entered into a stipulation subject to conditions set by Judge Carol Edmead.  Judge Edmead explicitly advised that if the parties went forward, based on Sotheby's explicit promises to give up (1) all economic interest in the artwork, including charging any fees for insurance, storage, etc., (2) any right to pursue sale and commissions, and (3) its statement that it had possession of the artwork, she would grant the interpleader motion in favor of Defendant Sotheby's.  Judge Edmead's order was entered on February 2, 2020. *See Exhibit D*.

88.     Despite Plaintiff's counsel's skepticism around Defendant Sotheby's promises to the court, Plaintiff could not dislodge Judge Edmead's position that the conditions imposed on and agreed to by Sotheby's counsel were sufficient to inform her decision.

89.     Accordingly, Plaintiff was forced to accept the court's conditions but specifically requested that Plaintiff's right to sue Sotheby's be explicitly preserved.  Judge Edmead agreed and the Stipulation specifically maintains that Plaintiff Swan reserves the right to sue Defendant Sotheby's. The Stipulation reflects the conditions imposed and agreed with Judge Edmead, it was not a mutually negotiated settlement between the parties.

90.     Plaintiff never directed Defendant Sotheby's to hold the artwork, never agreed to Defendant Sotheby's holding the artwork, and never agreed with the conditions ***set by Sotheby's*** for release of the artwork, it is for these reasons, among others, that Plaintiff

reserved her rights in the Stipulation to sue Defendant Sotheby's. Plaintiff also never agreed to limit her rights to sue either Defendant to a specific forum.

91.    Despite Defendant Sotheby's promises to the court and the conditions the court imposed on Defendant Sotheby's, Defendant Sotheby's broke its promises to the court and violated the Stipulation in a significant and material manner thus voiding its purpose.

92.    In the months after the Stipulation was signed and the order issued, Defendant Sotheby's continued to work with Defendant Page to coerce Plaintiff Swan to sell the artwork through Sotheby's and split the proceeds with him even though Defendant Sotheby's was prohibited from having any economic interest in the artwork. Defendant Page should have been indifferent to who sold the artwork or whether it would be sold at all but spent months advocating and delaying settlement progress to coerce Plaintiff into giving up and selling the artwork via Sotheby's.

93.    After Defendant Page's efforts at coercion with the carrot of splitting proceeds fell fall, Attorney Brankov advised that Defendant Sotheby's outside counsel wanted to connect with Plaintiff's counsel.  The collusion and coercion with the stick by the Defendants was furthered when Defendant Sotheby's outside counsel stated that Plaintiff Swan was liable to Defendant Sotheby's for storage fees, insurance fees, etc., but that such fees would be forgiven if she pursued a sale of the artwork with Sotheby's.

94.    This economic coercion by Defendant Sotheby's was in furtherance of its continued true efforts and its real collateral objective in bringing the bogus interpleader action, which was to interfere with Plaintiff's ability to retrieve her artwork from the buyer directly, and instead

maintain a position where Defendant Sotheby's could pursue commissions in connection with the sale of artwork, something that was explicitly prohibited by Judge Edmead via the stipulation.

95.     At all times from the time Defendant Sotheby's learned of Plaintiff Swan's ownership claim and after it agreed to Judge Edmead's conditions, Defendant pursued its collateral objective of profiting from the sale of the artwork with an intentional disregard for Plaintiff's legal property rights by (1) making false statements to Plaintiff as to the law, (2) making false statements in its interpleader complaint, (3) making numerous economic threats and other intimidation tactics (e.g. sending the interpleader complaint naming Plaintiff as a defendant to her home, after Plaintiff's counsel explicitly agreed to accept service on Plaintiff's behalf), and (3) making false promises to Judge Edmead. Defendant Sotheby's actions were calculated to interfere with and did in fact interfere with Plaintiff's efforts to have her property returned to her.

96.     At all times from the time Defendant Sotheby's entered into the consignment agreement with Defendant Page, Defendant Sotheby's has failed to exercise a minimum degree of due diligence to ensure prior to sale that the artwork was not stolen and/or misappropriated or to confirm Defendant Page had good title to the artwork, and even after learning that Defendant Page likely did not have good title, continued to assist him with obtaining the proceeds from the sale, keeping him in the litigation via the interpleader by blocking Plaintiff's access to the buyer. These actions were substantial and deliberate and kept Defendant Page's

unlawful claim on the artwork in play when such claim would have been extinguished if Plaintiff was able to seek her property directly from the buyer.

97.      Had Sotheby's exercised the same degree of due diligence to find Plaintiff Swan when they needed to sue her for the bogus interpleader action, either before the sale of the artwork or after Plaintiff Swan contacted Defendant Sotheby's about her claim, Plaintiff would have been able avoid the mental stress, anguish and costs associated with having property that she finally located after 30 years returned to her in accordance with New York Law.

98.      At all times from the time Defendant Sotheby's entered into the consignment agreement with Defendant Page, Defendant Sotheby's on its own initiative and/or at the request of Defendant Page, engaged in a series of marketing activities that falsified the nature and the origin of the artwork in connection with placing the artwork in the public domain for sale in furtherance of its own profit and profit for Defendant Page. Defendant Sotheby's decreased the value of the work and provided a false narrative in the catalogue description; these action not only misled the public but unjustly interferes with Plaintiff's future ability to have the true origins of the artwork fully and fairly considered as part the artwork's retail value.

99.      At all times from the time Defendant Sotheby's entered into the consignment agreement with Defendant Page, on information and belief, Defendant Sotheby's was contractually allowed to set the price based on the lower end of the estimate of the artwork's auction value, and brought the artwork at an auction market value between $30,000 and $40,000 in October 2019, an auction market value lower than Plaintiff's independent appraiser's auction market value appraisal of $60,000 for the same time period in 2019.

100.    Defendant Sotheby's policy of placing lower auction values of artwork meant that

Plaintiff's artwork was sold without her permission at a lowball auction value that will act as a

drag on future auction values and retail values of the artwork in the amount of $20,000 which

represents an economic detriment to Ms. Swan. [3]

101.    Based on the same independent appraiser's work, the auction market value at the time

of this action is $75,000. Plaintiff asserts that the auction market value is a conservative

estimate of the artwork's true value since auction value is typically lower than retail value.[4]

102.   At all times from the time Defendant Sotheby's entered into the consignment agreement

with Defendant Page, on information and belief, Defendant Sotheby's took direction from

Defendant Page and provided substantial assistance to Defendant Page's efforts to interfere

with Plaintiff Swan's ownership rights even after Defendant Sotheby's knew or should have

known the legal problems with his claim based on the laws of this State.

103.    At all times from the time Defendant Sotheby's was contacted by Plaintiff Swan,

Defendant Sotheby's subjected Ms. Swan to treatment that caused Ms. Swan to feel extreme

grief, sadness, frustration and feelings of belittlement.

104.    At all times Defendant Page, knew that the artwork was for the store Fertility and that

the proprietors of Fertility were Isaia Rankin and Phyllis Swan and therefore knew once Plaintiff

---

[3] Based on an independent appraisal with a qualified appraiser, the auction market value as of October 2019 was $60,000 and the value at the time of the action is $75,000.
[4] Retail Value is typically lower than auction value due to the larger size of market and extended period to buy. http/www.sybariscollection.com blog "Comparing Fair Market Value with Insurance Value."

Swan's made her claim that such claim superseded his claim of acquiring the artwork as a gift, even if he had documentation of such gift, which Defendant Sotheby's said it did not have.

105.    At all times from the time Defendant Page entered into the consignment agreement with Defendant Sotheby's, Defendant Page engaged in a plan to sell the artwork for his economic benefit and to keep Ms. Swan from pursuing her legal rights to have the artwork returned to her. Defendant Sotheby's was a willing participant in this plan and took its own actions in furtherance of the plan to gain profits at Plaintiff Swan's expense.

1st   **Cause of Action- Conversion Defendants Sotheby's and Page**

106.    Plaintiff Swan re-asserts the allegations in paragraphs 1 -105 above and incorporates them by reference as if fully set forth herein.

107.    Defendant Sotheby's and Defendant Page colluded and engaged in intentional and deceptive conduct, when Defendant Sotheby's suggested in December 2019 that Plaintiff Swan had no rights to the artwork because title to the artwork passed to the buyer upon payment to Defendant Sotheby's when Sotheby's legal counsel knew or should have known the law in New York was in opposite of those statements.

108.    Defendant Sotheby's from the date of the consignment agreement with Defendant Page to the present, was in possession of the artwork, retained the sole right to repossess the artwork from the buyer, and upon Plaintiff's Swan's written demand on December 10, 2019, rescinded the sale of the artwork and took possession only after Plaintiff made legal efforts to be connected directly with the buyer.

109.     Defendant Sotheby's interference resulted in it obtaining possession of the artwork without Plaintiff's consent and it retains possession of the artwork without Plaintiff's consent.

110.     Once Defendant Sotheby's received evidence of Ms. Swan's superior possessory interest and superior title in the artwork as a proprietor of Fertility who had never voluntarily given up possession of the business asset artwork to any party, Defendant Sotheby's and Defendant Page continued to keep the artwork from Ms. Swan, to exercise dominion and control over the artwork and to discourage and intimidate her with financial threats.

111.     Defendant Sotheby's and Defendant Page further colluded to keep the artwork from Ms. Swan, including but not limited to attempting to coerce her to agree to sell the artwork with Defendant Page via Sotheby's against the clear conditions required in a court order, in lieu of returning it to her.

112.     In every instance both Defendant Sotheby's and Defendant Page's goal was to deny Plaintiff Swan's rights as the true owner, keep the artwork out of Plaintiff's possession and to profit from the sale of the artwork to Plaintiff's detriment.

113.     Defendant's lowball auction valuation and sale of the artwork below the true auction value has also deprived Plaintiff of economic value of at least $20,000 and its false narrative to the public via the catalogue descriptions deprives Plaintiff of additional value, to be determined at trial, associated with the true origins of the artwork.

**2nd Cause of Action Replevin Against Defendant Sotheby's**

114.     Plaintiff Swan reasserts the allegations in paragraphs 1-113 above and incorporates them by reference as if fully set forth herein.

115.    Defendant Sotheby's took possession of the artwork from Defendant Page, repossessed the artwork from the buyer and to date retains possession of the artwork without Plaintiff Swan's consent.

116.    Based on statements by Defendant Sotheby's attorney Schilleri, Defendant Sotheby's was not provided with any written or other documentation that supported Defendant Page's claim that the work was gifted to him and made no efforts to perform even the slightest due diligence to confirm the artwork's provenance.

117.    Upon information and belief, Defendant Sotheby's has a policy of not verifying the title and/or confirming the provenance for artwork under a certain dollar threshold amount and Defendant Sotheby's failure to confirm Defendant Page's story and their decision to place the artwork up for sale without performing any due diligence appears consistent with this policy.

118.    Plaintiff Swan provided Defendant Sotheby's with sufficient evidence based on New York Partnership Law that she had a superior possessory interest over Defendant Page; thereafter Defendant Sotheby's continued its failure to perform any due diligence and failed its duty to protect the rights of true owners and the buying public and instead chose to collude with Defendant Page so that both Defendants could profit from the sale of the artwork with intentional disregard for Plaintiff's property rights.

119.    Pursuant to New York Partnership Law Section 51 as a partner in Fertility and a collaborator that worked on the creation of the work with Mr. Basquiat and Mr. Rankin as a business card for the business, Plaintiff Swan has superior rights and title to the work over Defendant Sotheby's and Defendant Sotheby's is obligated to return the work to Plaintiff Swan.

120.     On or about August 31, 2020, Defendant Sotheby's obtained a full release from

Defendant Page; accordingly, Defendant Sotheby's is not legally prohibited from returning the

work to Ms. Swan and should suffer no legal liability from returning the work to her and/or has

no legal liability to Defendant Page due to Defendant Page's representations at the time of

consignment that he had good title being revealed as untrue.

**3rd Cause of Action Request for Declaratory Judgment Quiet Title-Defendant Page**

121.     Plaintiff Swan reasserts the allegations in paragraphs 1-120 above and incorporates

them by reference as if fully set forth herein.

122.     Plaintiff Swan as the proprietor of Fertility and a collaborator of the work with Mr.

Basquiat and Mr. Rankin that created the artwork/business card, provided Defendant Sotheby's

and Defendant Page with clear and convincing evidence including but not limited to, reference

to New York Partnership Law, that she was a proprietor of Fertility, that she was posthumously

identified as a proprietor of the business in the artwork by Mr. Basquiat, and that she never

voluntarily gave up her rights in the artwork to any person, including Mr. Rankin, her business

partner and co-owner of the business asset.

123.     Plaintiff asserts that Defendant Page does not have good title to the artwork, nor does

he have any possessory right to the artwork that is superior to that of Plaintiff. Plaintiff doubts

Defendant Page's gift story, however even if Defendant Page's story were true, Defendant Page

could not have acquired legal title to the artwork since pursuant to New York Partnership law,

Mr. Rankin had no right to gift a business asset to a third party without obtaining consent from

his business partner, Plaintiff Swan.

124.     Based on New York CPLR 4519, known as the Deadman's Statute, Defendant Page is

likely precluded from offering admissible testimony to support his story that Mr. Rankin, who

died six months after the purported "gift", in fact gifted the work to Defendant Page.

125.      Since Defendant Page refuses to allow Defendant Sotheby's to return the artwork to

Ms. Swan and maintains his gift story, there is a substantial controversy and a live dispute

between the Plaintiff and the Defendants having adverse legal interests of sufficient immediacy

and reality to warrant the issuance of a declaratory judgment. The dispute, therefore, between

Plaintiff and the Defendants is a justiciable controversy appropriate for declaratory judgment

and entry of a judgment declaring that Plaintiff Swan is the sole owner of the artwork in

compliance with the Declaratory Judgment Act, 28 U.S.C. §§2201, 2202.

**4th Cause of Action Abuse of Process Defendant Sotheby's**

126.     Plaintiff Swan reasserts the allegations in paragraphs 1-125 above and incorporates

them by reference as if fully set forth herein.

127.     Defendant Sotheby's was provided significant evidence of Plaintiff's claim in her

November 14, 2019 letter; such evidence was so strong that Defendant Sotheby's agreed to

rescind the sale within eleven minutes of receiving the letter.

 128.     Despite its agreement to rescind on November 14, 2019, Defendant Sotheby's on its

own initiative and/or at the direction of Defendant Page, decided to abandon the rescission and

misrepresent on December 10, 2019 that Plaintiff's rights were lost because title had

transferred to the buyer.

129.     Based on Defendant Sotheby's statements regarding title and the buyer and its failure to confirm rescission of the sale after receiving Plaintiff's demand letter in December 2019, Plaintiff moved to subpoena Defendant Sotheby's for the buyer's contact information.

130.     Defendant Sotheby's outside counsel specifically threatened to retaliate against Plaintiff by stating that if Plaintiff did not withdraw her subpoena action, Defendant Sotheby's would file an interpleader action and seek legal fees from her, this threat was made even though Plaintiff had done nothing wrong and was simply pursuing her legal rights.

131.     At the time of this threat Defendant Sotheby's did not meet any of the material prerequisites to qualify as an interpleader since it had an economic interests in the artwork (which was confirmed by Judge Edmead), it was an agent for Defendant Page and not a true neutral party, and by its own complaint should have had no meaningful liability to Defendant Page since it alleged in its interpleader complaint that Defendant Page made contractual representations regarding good title that would represent a material breach of contract if such representations were found to be untrue.

132.     Defendant Sotheby's terms and conditions for accessing their auction website and their privacy policy do not prohibit them from disclosing information related to legal process, compliance, and law enforcement. Moreover, according to Attorney Brankov, the buyer was still interested in the artwork as late as January 21, 2020, such that Defendant Sotheby's, who itself said "title passed to the buyer upon sale,"  had no rational reason to oppose Plaintiff's subpoena.

133.     In lieu of taking any action directly opposing the subpoena or letting the court decide the action on its own, Defendant Sotheby's made an intentional choice to use the interpleader action not only to intentionally keep Plaintiff from connecting directly with the buyer, her best course of action to have the artwork returned to her, but also to retaliate against Plaintiff for pursuing the subpoena and to further Defendant's Sotheby's collateral objective of keeping itself and/or Defendant Page in the position to profit from the sale of the artwork, by obtaining control of the artwork under the guise of being an neutral stakeholder and then using that position to continue to collude and coerce Plaintiff into a sale via Sotheby's.

134.     Defendant Sotheby's knew  it did not meet the most basic requirements for an interpleader before filing the complaint and it only acquiesced to the requirements in response to Judge Edmead's conditions; Plaintiff asserts that Defendant Sotheby's abandoned the promises made to a New York Supreme Court Judge to continue pursuing its same behavior prior to filing the interpleader, that it never intended to be a true interpleader and that Defendant Sotheby's used the interpleader action for a reason other than its intended purpose and that this purpose was intended to harm Plaintiff's  property interests and gain an unjust economic advantage for the Defendants.

135.     Defendant Sotheby's bogus interpleader action not only interfered with Plaintiff Swan rights to receive her property, but also caused her to incur increased legal fees to address the action.

136.     Defendant Sotheby's intentional act of sending the interpleader directly to Plaintiff's home naming her as a defendant even though her attorney agreed to accept service on her

behalf, was another intentional act that harmed Plaintiff, caused her significant stress, worry and anxiety.

### 5th Cause of Action Aiding and Abetting Conversion Defendant Sotheby's

137.     Plaintiff Swan reasserts the allegations in paragraphs 1-136 above and incorporates them by reference as if fully set forth herein.

138.     At all times Defendant Sotheby's and Defendant Page's actions, both joint and several, were intentional and in reckless disregard for Plaintiff Swan's ownership rights, for the sole purpose of Defendants' receiving of profits from the sale of her artwork for their benefit.

139.     Once Defendant Sotheby's attorneys were notified of Plaintiff Swan's claims on November 14, 2019, those attorneys knew or should have known based on case law in New York involving artwork disputes that Defendant Page's good title representations were unsustainable, and it would be highly unlikely that he could prove a superior possessory interest over Plaintiff Swan, especially since Defendant Page had no documentation and would likely be precluded from direct testimony pursuant to CPLR 4519.

140.     Once Defendant Sotehby's had credible information regarding both claims, although it originally agreed to follow its standard protocol to rescind the sale, something happened between November 14th and December 10th to cause Defendant Sotheby's to do an about face and abandon its own policy.

141.     Since Defendant Sotheby's had previously been taking its direction regarding the proceeds from Defendant Page, Plaintiff asserts that Defendant Page had a role in Sotheby's

broken promise and that Defendant Sotheby's made the false statement that "title had passed to the buyer" in order to justify immediately releasing funds to Defendant Page.

142.     Defendant Sotheby's also chose to ignore the proof Plaintiff Swan had previously provided and suddenly required additional unspecified proof or a court order within days or they would release funds to Defendant Page. At all times, Defendant Sotheby's goal was to assist Defendant Page in receiving funds from the sale of artwork that Defendant Sotheby's reasonably knew Defendant Page did not have a valid claim to considering the facts and the law.

143.     After learning of Plaintiff's claim, Defendant Page clearly continued his plan to go through with the sale of the artwork without Plaintiff's permission and to keep proceeds from the sale for himself, in whole or in part, to Plaintiff's detriment. Defendant Page continued these actions even though he possessed actual knowledge based on his time working with Mr. Rankin that Plaintiff Swan was in fact business partners in Fertility with Mr. Rankin.

144.     Defendant Sotheby's took substantial actions to assist Defendant Page in his efforts to convert Plaintiff Swan's property and did so in an effort to garner profits that would accrue to Defendant Sotheby's in the event Defendant Page's efforts were successful.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Phyllis Swan, respectfully request that the Court enter judgment as follows:

(a) Directing Defendant Sotheby's to immediately return the artwork to Plaintiff Swan;

(b) Issuing a Declaratory Judgment declaring Plaintiff Swan as the sole owner of the artwork and/or that Plaintiff has superior possessory and title rights over Defendant Sotheby's and Defendant Page;

(c) Awarding compensatory damages in favor of Plaintiff and against Defendants jointly and severally, arising out of Defendants' collaborative actions including but not limited to, diminution of the artwork's value, keeping the artwork, a thing of economic and *emotional value* out of Plaintiff's possession for a significant period of time, directly requiring Plaintiff hire counsel to defend her rights, having Plaintiff incur counsel fees to address retaliatory litigation and causing Plaintiff significant emotional distress in an amount not less than $150,000;

(d) Awarding punitive damages to Plaintiff against Defendant Sotheby's based on its repeated conduct in violating the public policy and laws of this State and specifically with regard to its conduct to intentionally interfere, reject and evade Plaintiff's ownership interests in favor of its own profit and its misrepresentation of goods it offered to the public for sale in an amount not less than $500,000;

(e) Awarding Plaintiff, the costs of all legal actions to have the artwork returned to her, including but not limited to court costs, pre-judgement interest and attorney's fees for the entire action; and

(f)    Granting such other relief as the Court may deem just and proper.


Dated: April 17, 2023

                                        Respectfully Submitted,

                                        By: _____

                                        RENEE EUBANKS, ESQ.
                                        Attorney for Plaintiff
                                        1180 Ave of the Americas, 8th Floor
                                        New York, New York 10036
                                        212-390-8949

34