UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PHYLLIS SWAN, Plaintiff, -against- ROBERT EVERETT PAGE IV, Defendant. | : | 1:22-CV-10406-MKV **DEFENDANT AND COUNTERCLAIM PLAINTIFF ROBERT EVERETT PAGE IV'S FIRST AMENDED COUNTERCLAIM** |

Pursuant to Rule 13(a) of the Federal Rules of Civil Procedure, Defendant and Counterclaim Plaintiff Robert Everett Page IV ("Page"), by and through undersigned counsel, asserts the following counterclaim against Plaintiff and Counterclaim Defendant Phyllis Swan ("Swan"), and alleges as follows:

## NATURE OF THE ACTION

1. This is an action by Counterclaim Plaintiff Page for declaratory relief to quiet title and to establish that he has full, right, and proper title to the drawing known as *Isaia's Fertility* by Jean-Michel Basquiat ("Basquiat"), measuring 9 by 8½ inches and executed circa 1980–1985 (the "Drawing"), contrary to the allegations made by Swan in the First Amended Complaint dated April 17, 2023 (Dkt. No. 10) (the "Amended Complaint"). In the alternative, Page seeks a declaration from this Court that Swan does not have legal title to the Drawing.

2. Page asserts this Counterclaim in the alternative to his Answer to the Amended Complaint, pursuant to Federal Rule of Civil Procedure 8(d). Nothing herein shall be deemed an admission of any fact denied in Page's Answer, or of any liability, wrongdoing, or obligation to Swan or any other party, all of which are expressly denied.

3. By asserting her meritless claim of ownership, Swan has injured Page by hampering his ability to control and dispose of the Drawing. Swan interfered with Page's ability to conclude the sale of the Drawing, which Page had consigned to Sotheby's and which Sotheby's sold at auction on October 2, 2019. Swan's interference caused Sotheby's to rescind the sale of the Drawing. The Drawing remains in Sotheby's custody following the resolution of the interpleader action brought in New York Supreme Court by Sotheby's in January 2020 and the parties' stipulation that Sotheby's would hold the Drawing while Swan and Page adjudicated their claims to the Drawing.

4. Swan filed this action on December 8, 2022. Despite the passage of time and an attempted amicable resolution, Swan and Page have not resolved their dispute. Accordingly, Page seeks this Court's assistance in quieting title to the Drawing in his favor or, in the alternative, in declaring that Swan has no cognizable interest in the Drawing.

**PARTIES, JURISDICTION, AND VENUE**

5. Counterclaim Plaintiff Robert Everett Page IV is a natural person and a resident and domiciliary of the State of New York.

6. Counterclaim Defendant Phyllis Swan is, upon information and belief, a natural person and a resident and domiciliary of the State of Ohio.

7. This Court has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367 because the Counterclaim is sufficiently related to the claims in the First Amended Complaint that it forms part of the same case or controversy under Article III of the United States Constitution.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Swan commenced this action in this District and has thereby consented to venue here with respect to any

counterclaim arising out of the same transaction or occurrence, and because a substantial part of the events giving rise to the claims occurred within this District.

## FACTS

### A. The Origins of Fertility and the Drawing

9. Isaia Rankin ("Rankin") was a designer and entrepreneur who moved to New York City in the early 1980s to start a fashion business. At the start of his career, Rankin operated informally out of his apartment in the East Village, selling clothing and developing his brand under the name "Fertility." At that time, Fertility was merely a creative concept and a brand that Rankin was building — it was not incorporated or otherwise formally organized as a business entity.

10. During this period, Rankin met Jean-Michel Basquiat, a young New York artist who was then at the beginning of his career. The two collaborated, and Basquiat created designs, including T-shirts and postcards, intended to reflect Rankin's business vision. The Drawing, titled *Isaia's Fertility*, was created by Basquiat as an informal sketch depicting Rankin's East Village apartment store.

11. Although Basquiat wrote "Proprietors Isaia Rankin Phyllis Swan" on the Drawing, this was an informal sketch for a business concept that never came into existence. The business that Rankin eventually built — Isaia NYC — was a distinct and later entity in which Swan had no ownership, partnership, or other interest. Swan was not Rankin's business partner in Fertility or in any other venture, whether formal or informal, and had no ownership or partnership interest in any of Rankin's businesses at any time.

12. The Drawing was never finalized or used to create any business materials for Fertility or any of Rankin's later ventures. The Drawing was never displayed, reproduced, or otherwise used in any advertising or promotional materials for any of Rankin's businesses.

13. The Drawing was not a business asset of Fertility or of any other entity. It remained the personal property of Basquiat from the time of its creation until his death.

**B. Page's Relationship with Rankin and the Founding of Isaia NYC**

14. Page moved to New York in 1985. He first encountered Rankin's work at Modern Girls, a SoHo boutique where Page was working that carried Isaia's designs. Rankin would visit the store weekly to deliver new merchandise and collect sales receipts. Over several months, Page and Rankin developed a strong rapport. As a newcomer to New York seeking to build a career in fashion, Page viewed Rankin as a mentor figure. After knowing Rankin for several months, Rankin approached Page about working together formally. Rankin hired Page, and Page soon began working at Rankin's office at 240 West 38th Street.

15. In or about 1986, Rankin founded Isaia NYC, a registered New York business entity with offices at 240 West 38th Street in New York. Isaia NYC was the formal realization of Rankin's business concept. Page served as Director of Sales and Marketing and was one of only four employees at the company. During Page's tenure, Isaia NYC experienced significant growth, with annual revenue climbing from $100,000 to over $2,000,000. Isaia NYC maintained an exclusive distribution strategy, with its designs carried at premier specialty retailers around the world, including Barney's and Charivari in New York, Ultimo in Chicago, Fred Segal in Los Angeles, Browns in London, and Seibu in Japan. Page held primary responsibility for sales, public relations, and press, and served as the primary liaison for major press outlets including *Vogue*, *Harper's Bazaar*, and the *New York Times*. Swan had no ownership role or partnership interest at Isaia NYC.

16. As Director of Sales and Marketing at Isaia NYC, and the company's primary liaison to the press, Page had direct visibility into the company's promotional materials and business records. At no time during his employment with Rankin or Isaia NYC did Page ever see

the Drawing, or see or hear any reference to the Drawing, in any business file, inventory, or promotional material of Fertility or Isaia NYC. The Drawing was never a business asset of Fertility, Isaia NYC, or any other entity, and was never treated as such by Rankin, by Page, or by anyone associated with those businesses.

17. Rankin was Page's first mentor in fashion and one of the most significant influences on his professional life. The two developed a close personal and professional relationship over the course of their years working together.

**C. Rankin's Illness**

18. In 1987, Rankin was diagnosed with HIV. His physical health began to decline seriously from that point. As Rankin was his friend and mentor, Page helped Rankin in obtaining medical care, including connecting him with Page's personal physician, Dr. Evan T. Bell, who diagnosed Rankin and took over his medical care. Over the following two years, Page was in close contact with Rankin, accompanying him to medical appointments and helping Rankin manage through his illness.

19. As Rankin's condition deteriorated, three Isaia NYC employees — Page, Noelle Nieva, and Megan Curran — continued running the company. Together with Lou Pearlman, Rankin's accountant and business advisor, they made the decision in or about 1989 to open a retail pop-up store on Spring Street in SoHo under the Fertility name to generate revenue to fund Rankin's nursing care. Swan was hired as a paid salesperson at the Spring Street store after it opened. Swan had no prior involvement, formal or informal, with Isaia NYC or any of Rankin's business activities before she was hired at the Spring Street store. Swan worked only at the Spring Street store and had no role in the Isaia NYC office or business.

20. During the final months of his life, Rankin was hospitalized for an extended period lasting approximately four months over the summer of 1989. During this final hospitalization,

Rankin was largely nonverbal and incommunicative. He had not been actively working for a significant period prior to this hospitalization due to his illness.

**D. Transfer of the Drawing to Page**

21. In the years prior to his death, Basquiat rented a studio and living space from Andy Warhol, an internationally recognized artist who lived and worked in New York City. Warhol died on February 22, 1987. Following Warhol's death, Basquiat remained in the rented apartment.

22. Basquiat, by then an internationally recognized artist, died without a will on August 12, 1988. Under N.Y. Estates, Powers and Trusts Law § 4-1.1(a)(4), his estate passed to his surviving parents, and his father, Gérard Basquiat, was thereafter appointed administrator and personal representative of Basquiat's estate.

23. Following Basquiat's death, members of his family took possession of his paintings and other valuable artworks from Basquiat's apartment, leaving behind the remaining contents, including personal effects, papers, notebooks, and other materials.

24. In doing so, Basquiat's family and estate abandoned and left unclaimed the personal effects that remained, including the Drawing. On information and belief, no one from the Basquiat family or estate ever inquired about, claimed, or sought the return of any of the effects left behind in the apartment, including the Drawing, at any time in the more than three decades that followed.

25. The Warhol estate, as landlord, was eager to recover possession of the apartment following Basquiat's death. Fred Hughes, Warhol's longtime business manager acting on behalf of the Warhol estate, asked Jennifer Goode ("Goode"), Basquiat's former girlfriend, to clear the apartment of its remaining contents.

26. At Hughes's instruction, Goode cleared the apartment and thereby took lawful possession of its abandoned, unclaimed contents. In the apartment, Goode found personal belongings, notebooks, and other items — including the Drawing — that were not then understood

to be of significant monetary value. On information and belief, no one from the Basquiat family or estate made any inquiries after Goode regarding any of the items left behind in the apartment.

27. Goode wished to give the Drawing to someone who would find it meaningful. Jenny Lumet ("Lumet"), a mutual friend of both Goode and Page, knew that Page had worked closely with Rankin and shared a deep connection with him. She informed Goode and, in or about the spring or early summer of 1989, Goode and Lumet delivered the Drawing to Page.

28. Upon receiving the Drawing from Goode, Page intended to keep it as his own property. As an informal sketch left behind in Basquiat's apartment, Page did not understand the Drawing to have significant monetary value. Rather, the Drawing's connection to Rankin held deep personal and sentimental significance for Page given their relationship. Page kept the Drawing based on his relationship with Rankin and his understanding that Rankin wanted him to keep it.

29. The Drawing was not transferred to Page pursuant to any caregiving arrangement or any agreement under which Page provided services to Rankin in exchange for the Drawing or any other thing of value. Rather, Page received the Drawing without paying consideration for it and without any expectation of compensation or exchange.

30. Rankin died on July 11, 1989. Following Rankin's death, neither Rankin's estate, his family, nor anyone acting on their behalf ever made any inquiry about the Drawing or Page's possession of it. Page has kept the Drawing since that time as a memento of his relationship with Rankin. The Drawing was the only tangible object Page had to remember Rankin by.

**E. Thirty Years of Open Possession**

31. From 1989 until 2019, Page held the Drawing openly and continuously, without concealment. At the recommendation of his friend Rodney Nonaka-Hill, Page had the Drawing framed. Over the years, he spoke to several friends about the Drawing and never attempted to hide

it. Rather, he displayed it prominently in his home as a cherished reminder of his friendship with Rankin.

32. During this thirty-year period, Page never heard anything from Swan, or from anyone formerly associated with any of Rankin's businesses, to suggest that the Drawing had been stolen or wrongfully retained. Isaia NYC and the Spring Street store were small operations with only a handful of employees, and Swan knew Page personally from her time working there. Despite this familiarity, and despite ample opportunity to do so, Swan never once contacted Page nor raised any concern about the Drawing during this entire period.

33. Swan's failure to assert any claim for thirty years, while Page held the Drawing openly, prejudiced Page and establishes that Swan inexcusably delayed in bringing any claim to the Drawing.

**F. The Sotheby's Sale and Swan's Interference**

34. In August 2019, Page consigned the Drawing to Sotheby's and Sotheby's sold the Drawing at auction on October 2, 2019.

35. In early October 2019, before Page received any proceeds from the sale, Swan contacted Sotheby's contending that she was the true owner of the Drawing. Sotheby's subsequently rescinded the sale and took possession of the Drawing.

36. Faced with Swan and Page's competing claims of ownership, Sotheby's filed an interpleader action in the Supreme Court of the State of New York in January 2020. After a hearing before Justice Carol Edmead, the parties entered into a stipulation (the "Stipulation") providing, among other things, that Swan and Page agreed to Sotheby's withdrawal from that action and that they would "continue to adjudicate their claims to title to the Drawing directly between themselves." Sotheby's also agreed to hold the Drawing, without cost of storage or insurance to either party, pending an instruction from the Court, or by both Swan and Page jointly, as to which

of them the Drawing should be released to. The Stipulation contains no provision obligating either party to adjudicate their dispute *on the merits,* nor any waiver of available defenses, including the statute of limitations.

37. The Supreme Court subsequently dismissed the interpleader action with prejudice without adjudicating the underlying ownership dispute between Swan and Page.

38. Swan filed this action on December 8, 2022. On March 27, 2023, Sotheby's filed a pre-motion letter stating its intention to move to dismiss the Complaint, arguing, *inter alia*, that Swan's own allegations established Page as a thief who stole the Drawing around the time of Rankin's death, rendering Swan's claim time-barred. The Court granted Swan leave to amend and Swan filed the First Amended Complaint on April 17, 2023.

39. Sotheby's and Page moved to dismiss the First Amended Complaint in its entirety. The Court granted the motion, finding, among other things, that Swan's conversion claim against Page was time-barred because the First Amended Complaint suggested that Page had stolen the Drawing in the late 1980s or early 1990s, and the applicable three-year limitations period had long since expired. *Swan v. Sotheby's Inc.*, No. 1:22-CV-10406 (MKV), 2023 WL 7183762 (S.D.N.Y. Nov. 1, 2023).

40. Swan appealed. The Second Circuit affirmed the dismissal of all claims against Sotheby's but vacated the dismissal of Swan's conversion and declaratory judgment claims against Page and remanded for further proceedings. *Swan v. Page*, 2024 WL 5165516 (2d Cir. Dec. 19, 2024).

41. On remand, Page moved to dismiss the First Amended Complaint. This Court denied the motion, finding that Swan plausibly alleged that Page is a good faith purchaser — specifically, because Swan alleged that Page received the Drawing in exchange for caretaking

services provided to Rankin, which the Court treated as consideration sufficient to trigger the demand-and-refusal rule. *Swan v. Page*, No. 1:22-CV-10406 (MKV), 2026 WL 836655 (S.D.N.Y. Mar. 26, 2026). The Court further noted that, should discovery reveal that Page is not a good faith purchaser but rather a mere recipient of an unauthorized gift, the demand-and-refusal rule would not apply and Swan's claim would be time-barred. *Id*.

42. Page is not a good faith purchaser of the Drawing. Page never entered into any agreement with Rankin or with anyone else in connection with the Drawing. The Drawing was left in Basquiat's apartment as part of the mass of personal effects abandoned and unclaimed by Basquiat's estate. At the instruction of the landlord's representative, Goode emptied Basquiat's apartment and thereby took lawful possession of its remaining, abandoned contents, including the Drawing. Page acquired title to the Drawing upon receiving it from Goode. No consideration passed in connection with the transfer, nor did Goode or anyone else represent that the transfer was in consideration for any services previously rendered.

43. An actual controversy exists between Swan and Page concerning ownership of the Drawing. The Drawing remains in Sotheby's custody and has not been released to either party. The ownership dispute that Swan and Page agreed in the Stipulation to adjudicate directly between themselves has never been resolved.

**COUNT I**
**(Declaratory Judgment)**

44. Page incorporates by reference the allegations set forth in paragraphs 1 through 43 of this Counterclaim as if fully set forth herein.

45. Page is the rightful owner of the Drawing and is entitled to its immediate possession. The Drawing was created by Basquiat and remained his personal property until his death in 1988. Following Basquiat's death, the Drawing became part of the mass of personal

effects abandoned and unclaimed by his estate. Goode thereafter took lawful possession of the Drawing and transferred it to Page, who received it without consideration and with the intent to keep it as his own. Page has held the Drawing openly since 1989 and has always maintained a claim of right to it.

46. Swan has no right, title, or interest in the Drawing. The Drawing was never a business asset of Fertility or Isaia NYC, and Swan had no ownership, partnership, or other interest in either business. Swan is therefore not entitled to any declaration of ownership, title, or right to possession of the Drawing.

47. Swan has demanded possession and control of the Drawing and has insisted on her right to ownership, title, and possession of it. Swan commenced this action asserting claims for conversion and declaratory judgment based on her alleged ownership interest in the Drawing. Swan has refused to yield her adverse claim to the Drawing or to recognize Page's title.

48. Swan's assertion of ownership, title, and right to possess the Drawing creates an actual controversy with Page over the ownership of the Drawing. This Court has recognized the existence of that controversy, has found that Swan has plausibly alleged competing claims to the Drawing, and has expressly noted that Page is free to assert a counterclaim for declaratory relief in this action. No prior proceeding has resolved the underlying ownership dispute between Swan and Page.

49. By virtue of the foregoing, Page is entitled to a judgment pursuant to 28 U.S.C. § 2201, et seq., declaring that all right, title, and interest in and to the Drawing is vested in Page, or, in the alternative, declaring that Swan has no right, title, or interest in and to the Drawing.

## PRAYER FOR RELIEF

**WHEREFORE**, Page respectfully requests that the Court enter an order and judgment in his favor and against Swan on each and every cause of action alleged against him, and:

(a) Declaring that all right, title, and interest in and to the Drawing is vested in Page or, in the alternative, declaring that Swan has no right, title, or interest in and to the Drawing;

(b) Awarding to Page his costs and disbursements incurred in this action, including reasonable attorneys' fees to the maximum extent allowed by law; and

(c) Awarding Page such other and further relief as the Court deems just and proper.

Dated: New York, NY
September 3, 2026

Respectfully submitted,

STUDIO LEGAL LLP

By: /s/Thomas Touchie
Thomas Touchie

447 Broadway 2nd FL #388
New York, NY 10013
(347) 620-6423
thomas@studiolegal.xyz

*Attorney for Defendant Robert Everett Page IV*